A93A2019. ENTERPRISE FINANCIAL CORPORATION
v. GEORGIA NUT & BOLT COMPANY et al.
(441 SE2d 908)

COOPER, Judge.

Appellant Enterprise Financial Corporation appeals from the trial court's grant of directed verdict to the appellees, Georgia Nut & Bolt Company and two individual guarantors, in this suit to recover a deficiency judgment following the sale of Georgia Nut's collateral.

Enterprise made several loans to Georgia Nut and acquired a security interest in its inventory, accounts receivable, and equipment and machinery. Appellees Walter Hendricks, Jr., and Richard Hendricks, the two principals of Georgia Nut, personally guaranteed the loans. Georgia Nut defaulted and Enterprise repossessed the collateral and sold it. Enterprise then brought this action against Georgia Nut and the two guarantors for the amount of the deficiency. Prior to the sale, the principal and interest owed on the loan was $330,219.51. Enterprise sold the collateral for $195,000. At the time of trial, the amount of deficiency was $155,000.

At trial, the president of Enterprise testified that the keys to Georgia Nut's facility were turned over to Enterprise on April 17, 1989, and that Enterprise took possession of the collateral on that date. Enterprise hired several former employees of Georgia Nut, including George Stoudemire, to conduct a physical inventory. Stoudemire testified that he began working for Enterprise around the first of May, possibly May 4 or 5, and was in charge of supervising the inventory process. He testified that the inventory took three weeks to complete and was finished around the end of May. An independent appraiser conducted an appraisal, dated May 30, of Georgia Nut's inventory and machinery and equipment. Utilizing the inventory prepared by Stoudemire, the appraiser gave the inventory a quick sale auction value of $40,000. He appraised the value of the machinery and equipment at $13,835. Enterprise produced evidence that as of July 28, the fair market value of Georgia Nut's accounts receivable was $31,399.33. Shortly after Stoudemire and the other former Georgia Nut employees came to work for Enterprise for the purpose of conducting the physical inventory, they began to operate their own nuts and bolt business from Georgia Nut's location under the name of GNB Fasteners, Inc. (GNB). Although GNB was not incorporated until July 1989, Stoudemire testified that GNB began making sales in May. In fact, documentary evidence in the record establishes that GNB made some sales as early as May 5. Stoudemire testified that

most of what GNB sold was purchased from outside suppliers; however, he admitted that some of Georgia Nut's inventory could have been sold. He testified that he did not think more than $10,000 of Georgia Nut's inventory was sold, but he really had no idea how much was sold. Stoudemire acknowledged that he had previously testified in his deposition that GNB had been selling items out of Georgia Nut's inventory. He further testified that part of his work for GNB involved trying to sell Georgia Nut's inventory to Georgia Nut's former customers. When Stoudemire was initially questioned about a GNB invoice dated May 18, 1989, he testified that the items reflected on the invoice had been purchased from an outside supplier. On further cross-examination by defense counsel, however, Stoudemire admitted that he had not initially noticed that the invoice reflected that GNB had sold 2,300 pieces of Georgia Nut's inventory. He also testified that another GNB invoice dated May 18 showed GNB had sold 250 pieces of Georgia Nut's inventory. Stoudemire admitted that he could not tell whether or not another GNB invoice reflected sales of Georgia Nut's inventory. Finally, Stoudemire admitted that additional sales of Georgia Nut's inventory had been made by GNB prior to the foreclosure sale. Although Stoudemire testified that he knew GNB would have to pay for whatever it took from Georgia Nut's inventory, there is no evidence in the record that any such payments were made or that Georgia Nut was credited for such payments against its underlying debt.

On July 18, 1989, Enterprise, after giving notice to the debtor and the guarantors, sold Georgia Nut's collateral at auction to Stoudemire, the highest bidder, for $195,000. At trial, after the close of Enterprise's case, the trial court granted the appellees' motion for directed verdict. The trial court found that there had been a number of dispositions prior to the July 18 foreclosure sale and that Enterprise had failed to give Georgia Nut or the guarantors notice of such sales as required by OCGA § 11-9-504 (3). The court further found that the sale of the collateral was not commercially reasonable and that Enterprise was precluded from obtaining a deficiency judgment because it had not rebutted the presumption that the value of the collateral was equal to the indebtedness since it failed to prove the value of the collateral at the time of repossession.

1. Enterprise argues that the sale of the collateral was commercially reasonable and that, even if it was not, Enterprise was still entitled to a deficiency judgment because it rebutted the presumption that the value of the collateral equalled the amount of indebtedness. "Where the commercial reasonableness of a sale is challenged by the debtor, the party holding the security interest has the burden of proving that the terms of the sale were commercially reasonable and that the resale price was the fair and reasonable value of the collateral.

The secured party must also prove the value of the collateral at the time of repossession and that the value of the goods does not equal the value of the debt." *Richard v. Fulton Nat. Bank,* 158 Ga. App. 595, 596 (281 SE2d 338) (1981). "[W]hen a creditor forecloses on secured property without the statutorily required notice to the debtor, or when the creditor conducts a commercially unreasonable sale, a rebuttable presumption is created that the value of the collateral is equal to the indebtedness. The creditor may rebut the presumption by introducing (1) evidence of the fair and reasonable value of the secured property, and (2) evidence that the value of the collateral was less than the debt. If the creditor rebuts the presumption, he may maintain an action against the debtor or guarantor for the deficiency (the difference between the fair and reasonable value of the collateral and the amount of the debt)." *Business Dev. Corp. of Ga. v. Contestabile,* 261 Ga. 886 (413 SE2d 447) (1992). "If the creditor conducts a commercially unreasonable sale and does not rebut the presumption . . . , he loses the right to recover the deficiency against the debtor and the guarantor." (Emphasis omitted.) Id. at 886-887. "Proof of the value of the collateral is required to be the value at the time of repossession. *Granite Equipment Leasing [Corp. v. Marine Dev. Corp.,* 139 Ga. App. 778 (230 SE2d 43) (1976)]." *First Nat. Bank v. Rivercliff Hardware,* 161 Ga. App. 259, 260 (287 SE2d 701) (1982).

Enterprise first argues that it is entitled to a deficiency because it presented evidence that the amount of the debt exceeded the fair market value of the collateral at the time of disposition. However, this contention ignores the fact that when the debtor challenges the commercial reasonableness of the sale, the secured party has the burden of proving that the resale price was the reasonable value of the collateral at the time of repossession and that the value of the collateral did not equal the value of the debt. See *Richard,* supra at 595-596. Thus, in order to seek a deficiency judgment, Enterprise was required to show what the value of the collateral was at the time of repossession. See *Borden v. Pope Jeep-Eagle,* 200 Ga. App. 176 (5) (407 SE2d 128) (1991).

Enterprise argues that it established the collateral's value at the time of repossession because it did not actually take possession of the collateral until early May, the physical inventory was completed May 1, and there is no evidence that the value of the collateral changed between the date of the appraisal, based on the May 1 inventory, and the July 18 foreclosure sale. This contention ignores the undisputed testimony at trial. Enterprise's president testified that the keys were turned over to Enterprise on April 17 and that it took possession of the collateral on that date. While Enterprise may not have had the locks on Georgia Nut's facility changed until several days later, this does not mean that it did not have possession of the collateral. It is

clear that the physical inventory was not complete as of May 1 since Stoudemire testified that he was in charge of the inventory process, that he did not begin working for Enterprise until May 4 or 5, and that the inventory, which took three weeks to complete, was finished around the end of May. Moreover, the independent appraiser's report is dated May 30. The record thus establishes that the independent valuation of Georgia Nut's assets took place approximately a month and a half after Enterprise took possession of the collateral.

While the date of the appraisal alone does not show that Enterprise failed to establish the value of the collateral at the time of repossession, we cannot say on the face of this record that Enterprise has shown that the value of the collateral did not change between the time of repossession and the time of the appraisal. The record establishes that Enterprise gave Stoudemire and the other former Georgia Nut employees unrestricted access to Georgia Nut's facility and collateral for the purpose of conducting a physical inventory. During the time these individuals were conducting the inventory, the month of May, they began to operate their own business of an identical nature from Georgia Nut's location. Stoudemire admitted selling some of Georgia Nut's inventory and did not really know how much of the inventory they sold. Furthermore, Stoudemire admitted that several GNB invoices for the month of May indicated that GNB had sold some of Georgia Nut's inventory during that time as its own. Moreover, there is no evidence in the record that Georgia Nut was ever credited for such sales of its inventory against its underlying debt. The record thus establishes that Enterprise allowed an interested third party to sell Georgia Nut's collateral as its own during the time that this third party was preparing a physical inventory of Georgia Nut's assets and prior to the date of the appraisal based on that inventory. While we recognize that conducting an inventory of nuts and bolts might take some time to complete, we do not believe that allowing the party conducting the inventory to sell such inventory as its own without any accounting thereof is commercially reasonable. Although it is unclear from the record how much of Georgia Nut's inventory was sold by GNB, we cannot say that Enterprise established that the value of the inventory did not change between the date of repossession and the date of appraisal and thus cannot say that Enterprise established the value of the collateral at the time of repossession. See *First Nat. Bank*, supra at 261. Accordingly, we find the trial court properly granted a directed verdict to the appellees.

2. In light of our holding in Division 1, we need not address Enterprise's remaining enumeration of error that it was not required to give Georgia Nut or the guarantors notice of the prior dispositions by GNB under OCGA § 11-9-504 (3).

*Judgment affirmed. Smith, J., concurs. Beasley, P. J., concurs in*

*judgment only.*

DECIDED MARCH 16, 1994.

*Smith, Gambrell & Russell, E. Kendrick Smith,* for appellant.
*Fine & Block, Paul R. Jordan,* for appellees.